Good morning. Good morning, Your Honors. I hope I don't sound like Billy Goat Gruff. Pardon me? I say, I hope I don't sound like Billy Goat Gruff. You sound fine. Sounds like you have what's going around. I've taken some antihistamine this morning, and it's unfortunately dragged me up. If I may, Your Honors, my name is Evan Murray. I represent the petitioner in this matter. May it please the Court. I hesitate to characterize this case as egregious, but I do think a review of the total record will demonstrate a substantial bias on the part of the immigration judge. We call it bias or prejudice against the petitioner. Especially concerning is the fact that the trial attorney in this case repeatedly made very leading statements to the petitioner and intentionally tried to confuse the petitioner. The petitioner in this case is a very uneducated man from China. He testified, and the record shows that his education was minimal. He could read a little, but he couldn't write. Let me stop you there for a second. That's one of the issues. He's supposedly illiterate, can read a little, whatever, but he seems to be the manager of a bookstore. Well, his testimony was, Your Honor, that yes, he and his wife ran a bookstore. His wife was more educated than he was, and she was the one that identified the books that they needed to purchase, and then he was sent out to obtain the books. And his main responsibility in the bookstore was to sort them out and organize them. But I think it was clear from his testimony that he wasn't the one making the decision as to which books were to be carried in the bookstore. I'm just wondering, how do you sort them out if you can't read? Well, I wasn't there, Your Honor, but it would seem to me that the wife could explain, these go here, these go here, these go here. Mr. Morris, how do you explain the inconsistencies in his testimony with regard to whether or not he knew that the, I'll call them the banned materials, were illicit materials? There seemed to be, in my reading of the record, some difference in his statements as to when he learned that this material was perhaps forbidden by Chinese authorities. He makes some statements about, you know, that's what the customers really wanted to read and so on, which seems to indicate that he learned before the day of the police raid that he was carrying contraband materials in his store. Your Honor, I would contend that a complete reading of his testimony would show that there is no discrepancy in what he told. He stated very clearly in his testimony that originally that what he stated was there were books that were inside the bookstore that were sold, and there were also shelves outside of the bookstore where people could bring materials and put those materials there, and that those books were free. They weren't sold by the bookstore, and the bookstore didn't even procure them. He testified that the books Well, there was some inconsistency in his testimony about whether some of them were given away and some of them were sold, was there not? I mean, the transcript is really difficult to follow. Yes, it is, Your Honor, and I concede that. And the question is, does it compel, the standard of review, does it compel the opposite conclusion to that reached by the finder of fact, which was that he was prevaricating? Well, I would assert, Your Honor, that as you go through the testimony, and I have some that I would like to read to the Court. Well, I think we've all read the testimony. You know, you urged us to look at the whole record. What do we do with the I.J.'s demeanor finding, that there were long pauses and puzzled looks when he was being asked questions involving prior inconsistent statements? Well, he was being asked questions about things that occurred some substantial time before, and I think the record reflects accurately that he was trying to remember correctly so that he could respond accurately. I don't think a long pause could necessarily be held against him as a discrepancy. I mean, that's a very subjective statement, Your Honor. That's why demeanor is hard for us as appellate judges to gauge on appeal, and we have to give some deference to the finder of fact. I mean, I'm sure you've tried a lot of cases where you asked a witness a very difficult question and there was a very long and pregnant pause in the courtroom while the witness was trying to figure out how he was going to get around this hard question. That's the kind of thing that is the basis of a demeanor finding. And I concede that, Your Honor. Certainly in a very fair situation, we have to defer to the judgment of the immigration judge. In this situation, however— It seems to me the record would also suggest that if he answered too fast, he gave answers, for example, about passports, where he didn't fully understand the question. So he was faulted because of his quick answers, and when he took time to think about answers, he's faulted for pausing and thinking about them. So it's kind of a—I find the record a little confusing myself. And one of my concerns is that in several of these, nobody zeroed in with him to explain the inconsistencies, like the passport. It was a yes or no answer that the government asked for. So why didn't the defense counsel, his counsel, I should say, act to clarify some of these things? Unfortunately, Your Honor— You weren't there. I wasn't there. I can only speculate based on my own experience, and unfortunately I don't have a lot of time, but I will tell you time and time again, my experience in these kind of situations is one of the main problems is the translator, because Chinese and English are very different languages, and if the translator is not a good one, and there are many who are not good ones, then there's a real problem in trying to answer a question that the translator hasn't posed correctly. Now, obviously, we can't know that from the record, and so that's purely speculation, which I don't mean to do, but I will indicate to the Court that that's often the case. There's one very important thing I would like to point out to the Court, and my time is short. As I indicated to the Court earlier, the trial counsel made very leading and argumentative statements. One of the things that the trial counsel accused him of is stating in his testimony that his bookstore had been closed, and yet totally omitting that from his written statement. And the trial counsel said, why did you omit that from your written statement? Well, the fact is he did not omit it from his written statement. The BIA recognized that, though, didn't it? The BIA did recognize that. Even if you take that out of it, you've got a valid point there, but even if you take that out of it, the rest of the findings are supported. Isn't that what they said? Well, Your Honor, the BIA largely adopted what the trial judge did, but the trial judge, I think, showed very definite prejudice. This statement that I talked about --" They were reviewing the BIA ruling. Yes, that's correct, Your Honor. But as I indicated, to a large degree, the BIA ruling adopted essentially what the trial judge had said in her substantially lengthy decision. I see you're down to less than a minute. Would you like to reserve what's left? Yes, Your Honor. Thank you very much, sir. Thank you. Good morning. Good morning, Your Honors. I'm Erica Miles for Attorney General Lynch. May it please the Court. The Court should deny the petition because Zhao cannot show that this record compels the conclusion that he presented a credible claim and that it is his burden of proof to persuade the adjudicator, the trier of fact in this case. To first address a couple of points initially that counsel raised, allegations of bias and prejudice, even the translation errors, none of this was raised on appeal, so not exhausted. It's been waived. The Court really should not consider any of those types of arguments. Additionally, at the end there, you were just talking about which decision is on review before the Court, and the government in its brief contended that you review both the immigration judge and the Board's decision together because the Board essentially affirmed the IJ's decision as a whole and selectively discussed portions. And you look at the immigration judge's decision along with the Board's decision. Counsel just agreed with that position, and in their reply brief, they did not dispute that. So both decisions are on review. As for Mr. Zhao's ability to demonstrate that he presented or that the evidence compels the conclusion that he presented a credible claim, as this Court was just looking at best as to fundamental aspects of his claim, you were discussing about the question of when he learned. Excuse me. I'm confused about this, about what order we're reviewing. I don't see where the BIA adopted the IJ's order. The BIA, I can give you this, basically stated that the immigration inconsistencies portion of the IJ's decision that the immigration judge properly found inter alia and listed a few as examples. No, I understand they were reviewing it, but they didn't adopt it. What they said is they're reviewing the findings for clear error, and all other issues they're reviewing de novo. But the findings of fact are credibility determinations are all findings of fact. The underpinnings are factual. And review was for clear error, not de novo. So the board was relying on the immigration judge's findings of fact in affirming the decision as a whole and just selectively discussing some of those findings by the immigration judge. I won't quibble with you, but we see a lot of BIA rulings that say we adopt the IJ's order. They didn't do that in this case. They purport to do a de novo review and then review findings for clear error. As counsel pointed out, the board's decision is not particularly lengthy or all that involved in discussing the nature of the inconsistencies in the immigration judge's decision. It's really necessary to understand why those factual findings were reached in the first place. I'm just struck by the fact, I don't see this very often, that the IJ's ruling is 19 pages of single-spaced text. Is that just unique to Judge Marks? No, it's not. Or are IJ's being urged by the department to sort of spend more time and give a fuller explication of their ruling? Sure. I can tell you from my own experience, because I did clerk for immigration judges, and it's varied. A lot of it depends on if they render a decision that day at the end of the hearing orally. Sometimes they reserve because there were several days of hearing, and something that's so fact-intensive like this, they want to pull their thoughts together and ask for assistance. And they issue a written decision and call the parties back into the court then to just hand it out and read their decision. So there are many reasons that judges will opt to write out a decision versus do it memorializing the hearings. So to go back to Judge Silverman's question, then, is your position that the BIA was essentially reviewing all of the factual findings that the IJ made in that written order, although it didn't expressly adopt under Bourbon the order as its own findings? Correct. Well, our position is that it adopted all of the factual findings, and it just highlighted as examples. For example, the immigration judge's finding as to when he learned about the content of the books or whether the Public Security Bureau was giving him trouble when he was trying to leave. And they specifically addressed Petitioner's argument that the immigration judge erred on one account in saying that he didn't express in his statement that his bookstore was closed. And then the Board proceeded to say, and the demeanor findings were substantially supported. But all of these were by way of examples. But if I want to look at those findings, don't I have to go back to the immigration judge's 19-page decision to see what they're talking about? Yes, absolutely. Okay. All right. So you're saying that even our jurisprudence is we don't rely on items of evidence that the reasons given by the IJ, if the BIA doesn't mention it, you're thinking inter alia gets them off the hook from that rule and that we have to accept all of the issues? Well, you have much jurisprudence that says when the Board affirms the immigration judge's decision and supplies some reasoning, you do look to both, and you look at the immigration judge's decision to understand what lay behind the Board's reasoning. And not just inter alia. I understand that as to the ones that they mention. No, not just ones that they mention. Here, when the Board uses terms like inter alia or for example, that's a strong signifier that while they're affirming in total, here are a few examples. But additionally, the face of the Board's decision that it is fairly short and doesn't get into the weighing of the facts the way the immigration judge does indicates that this Court really does need to look. I'm not sure we're in the business of trying to read the signals of the BIA. I think given the number of cases we have to review and the different opinions that get issued, I don't think relying on inter alia is a rule that I feel comfortable adopting. Well, I'm not asking you to find that as a rule. I'm asking you to look at the face of the Board's decision and understand this is a very fact-intensive case. The immigration judge's decision is lengthy and provides the rationale. And the Board just pointed to it. Counsel, I understand. Sure.  Yes. On the passport, I find that confusing, ambiguous. It seems to be saying that he had an intermediary get his passport. Yes. Because he believed that if he went directly to the authorities, they wouldn't let him get out. So he used somebody else. And so there's this back and forth about whether he was actually stopped. And in the transcript, it sounds like he's trying to explain that he knew he would be stopped, but he wasn't stopped because he evaded the confrontation with the authorities by using the intermediary. Now, the counsel for the government, I take it it wasn't you. Counsel for the government asked to clarify. You weren't the counsel. No, I was not. Okay. So counsel says, I'm confused. Did the Public Security Bureau stop you when you tried to leave, yes or no? Answer, no. Well, that's not inconsistent with this notion that he got an intermediary to avoid that confrontation. So why didn't the immigration judge, if the immigration thinks this is an inconsistency, say, I don't understand then why you said what you said before? Now, maybe the fault lies with Raul Bajot's counsel, but generally, the immigration judges, if they're going to rely on these inconsistencies, have to give an opportunity for the applicant to explain what he means. In this case, there are a whole lot of these apparent or arguable inconsistencies, like how could he read and not be able to read and order books, where there was not any effort by the IJ to extract an explanation. In this particular example of the Passport Bureau stopping him, the question arose just directly by Homeland Security to clarify, did you have a problem? And he at first said he didn't remember. And that right there was an inconsistency where he had initially said, had not claimed that anything happened. Then further questioning ensued, and he gave waffling answers at that point. Excuse me. I just want to make sure. My time is up, but I'd like to finish answering your question. Because he changed from, I don't remember, and then he said he used somebody else because he figured he probably would have a problem. And then DH counsel said, so let me clarify. You did not have a problem. And then he said he did have a problem. I haven't read it. You're paraphrasing. You're not answering my question. He was given the opportunity to explain. Let Richard Fisher finish his question. Why didn't the IJ, who asked about you don't remember, how could you not remember, and morphed into this discussion about the explanations between going to apply for a passport where he would confront the authorities and deciding that he knew that they would deny it, so therefore he went to somebody else? That was a different – In his mind, he thought he was clarifying it. In his mind, but that wasn't sufficient for the immigration judge. And the immigration judge didn't say. I don't think that explains it to me. Can you elaborate? The immigration judge permitted DHS to – it was a cross-examination. And DHS was in the middle of trying to clarify whether it did or not. So there were several questions. The IJ ultimately relied on it. Yes. Whether it was clarified during cross-examination. She didn't have any trouble interrupting the cross-examination to begin with. And you're saying, well, she didn't want to interrupt because DHS lawyer was adequately exploring it for her. I'm not trying to surmise what was going on in the head of the immigration judge. I mean, I'm objectively looking at what's in the transcript. Absolutely. But even taking apart from this, though. You'll do a lot better if you don't interrupt the question. I apologize. I'm not as speaking as fast as you are, okay? So it takes me a little longer to get my question out. So I'm trying to get your perspective and your answer as to, in the terms of these immigration proceedings, where there are – we see all the time there are failures to communicate or language difficulties, to go back and look at a transcript as we're – that's all we can do. And you look at it and it cries out for some kind of clarification. I'm trying to understand your position as what the obligation of the IJ is who ultimately has to make the conclusion. And she does. She cites it as a prime example of his lack of credibility. And yet all that's in the record is the cross-examination of a partisan attorney who asks for a yes-or-no answer and lets it go at that. How does the IJ carry out her obligation to give him a clear opportunity to explain the apparent inconsistency? Where is it in this record? The inconsistency – the immigration judge's obligation is to take the evidence that's been presented on direct cross-examination, redirect all of the evidence in the record. And during cross-examination is when this first arose, and there were changing, waffling answers. That is in the record. And he had the opportunity to explain during that line of questioning because DHS counsel did point out, you said yes, you said no, which is it? And he said, no, I didn't. So it went from no, yes, no. Okay. And then redirect – there was no redirect examination by counsel. So immigration judge was left with this. I think I see you're out of time as well. Okay. Thank you. Thank you. Mr. Murray, back to you. You get the last word. I hope the Court would forgive me. Can you hear me? Yes. I'm sorry, Your Honors. I hope the Court would forgive me for addressing a question which you asked, opposing counsel, in regard to why there was such a lengthy written decision by the judge. And I would like to suggest that my own experience, where the case is very clear-cut, 95 percent of the time it's an oral decision, not a written decision. If the case is a difficult case, and if the judge is trying to decide one way or the other and wants to really substantiate the basis of her decision, in other words, even if her decision is questionable, she'll do a lengthy written decision and throw in everything including the kitchen sink. And I've had that happen on several occasions. I would love to tell you one experience where there was an initial oral decision by the judge, the case was remanded back to the judge, and the second time, even though there was absolutely no new testimony taken, so the judge was making a second decision based on the testimony that she had originally did an oral decision, she did a almost 19-page written decision. And if you read the oral decision and the written decision, it's like two totally different cases. So, okay. Okay. You're out of time. Judge Tallman has a question, and then we're out of time. I'd like to refer you to the excerpts of record of 153 on this issue of whether or not he had trouble departing. The judge did confront him during the examination by asking, so the Public Security Bureau didn't stop you from getting that passport, correct? Answer, I do not remember. Those are the questions by counsel. Then the judge turns to your client and says, you don't remember something as important as realizing that the Public Security Office did not block the passport being issued to you? Answer, yeah. When I asked Wang to handle it for me, the Public Security stopped me. Question, so now you're saying Public Security did stop you when you tried to leave? Answer, yes. Isn't that inconsistent with the position you're taking now, that he didn't have any trouble leaving the country? I didn't specifically take that position, Your Honor, but I agree with you. That record could be determined as being indecisive or conflicting. It goes to the heart of his claim. Yes, it does. The fact that he fears arrest if he returns, does it not? Yes, it does, Your Honor. However, as the other, your colleague. Judge Fisher. Judge Fisher, thank you. You're welcome. As Judge Fisher indicated, he testified that he used an agent to obtain the passport. And he was trying to explain why he used the agent to obtain the passport, because he was concerned that if he went himself to the Public Security Bureau, they wouldn't give him the passport. And I understand your position. I see we're out of time. Thank you, Ms. Miles. Thank you. The case just argued is submitted. Good morning. Thank you, Your Honors.
judges: Silverman, Fisher, Tallman